## Ex parte BROWN.

The statutory enumeration of persons of the same class by specific terms has the effect of restricting the statute to that class of individuals, and no consideration of the mischief to be remedied by the act is sufficient to justify the interoplation of other words to bring within the operation of the statute another class of persons whose business is distinctively different.

Words in a statute mandatory or directory must be taken in their natural and ordinary sense, and the intention of the Legislature must be collected from the words employed; and, where there is no ambiguity in the words, there is no room for construction.

While the court must seek for and give effect to the meaning of the lawmakers, its research must not extent beyond legislative language when couched in words that are free from any ambiguity, and it is not within the judicial power to create a public offense by supplying words in a statute.

The court in construing the pure food law (Laws 1907, p. 322, c. 151), creating the food and dairy department, defining in sections 6-10 "food," and punishing the sale of adulterated food, and declaring in section 10 that "the possession by any innkeeper, hotel keeper, restaurant keeper, or boarding house keeper of any food or drug which is adulterated or misbranded" shall be deemed to be keeping the same for sale, defining in sections 34 and 35 the word "drug," and declarinig the essentials constituting adulterated drugs, and in section 36 punishing any person violating any of the provisions of the preceding section cannot supply the word "druggist" in the quoted phrase in section 10, and a druggist selling packages of medicinal preparations not bearing an analysis of their contents is not guilty of a violation of the act.

(Opinon filed, December 31, 1907.)

Application of R. F. Brown for writ of habeas corpus for his discharge from imprisonment.    Granted.

*Aikens & Judge,* for applicant.    *Hall, Lawrence & Roddle,* contra.

FULLER, P. J.    Upon a showing deemed sufficient to invoke the original jurisdiction of this court, a writ of habeas corpus directed to the sheriff of Minnehaha county was issued, and the question presented for review on the obedient return of that officer is whether the statute authorizes the process under which the petitioner is detained.

Omitting formal requisites of the complaint sworn to by the food and dairy commissioner before a justice of the peace by whose warrant the petitioner was apprehended, the supposed public offense is described as follows:   "That on the 2d day of December, A. D. 1907, at the city of Sioux Falls, in said county R. F. Brown did he then and there being, and being then and there a druggist engaged in the business of selling drugs and medicines, wilfully, wrongfully, and unlawfully offer, expose for sale, and unlawfully sell to the said A. H. Wheaton certain prepared medicines, towit, one bottle of Peruna, one bottle of Hamburger's Drops, one bottle of Chamberlain's Diarrhœa Remedy, one bottle of Piso's Cure for Consumption, one bottle of Kodol for dyspepsia, and one bottle of Dr. King's New Discovery, all of said prepared medicines being then and there misbranded, in that none of the said medicines bore a qualitative statement of what it was composed, and each and all of said medicines not being then and there such drugs as are recognized in the United States Pharmacopœ and the National Formulary."    Whether the act complained of constitutes a public offense depends upon judicial powers to supply certain terms claimed to have been inadvertently  omitted by the Legislature, and which subject the petitioner to the operation of a penal statute in which the word "druggist" does not appear.

To sustain the assertion that a druggist who has sold prepared medicines containing no qualitative statement or analysis of contents is guilty of a misdemeanor, punishable by fine or imprisonment, we are directed to what is commonly called the "pure food law," being chapter 151, p. 322, Laws 1907, entitled, "An act to

provide for a state food and dairy commission; to prevent the adulteration, misbranding and imitation of foods, beverages and condiments, candies, drugs and medicines, meats and fish, and to regulate the manufacture and sale thereof, and of dairy products." Section 1 of the act creates the food and dairy department, and empowers the Governor, by and with the consent of the Senate, to appoint a commissioner to take charge of the office at a salary of $1,600 per annum. Section 2 authorizes such food and dairy commissioner to appoint and fix the compensation of a department analyst, and such inspectors and office assistants as he may deem necessary to carry out the provisions of the act. Sections 3, 4, and 5 define the duties of the commissioner and analyst, and make provision for the payment of their actual and necessary expenses and of other employees of the department by the state monthly upon duly itemized and certified bills. Without any reference to either drugs or medicines, the four succeeding sections of the act are devoted to a legislative definition of the term "food," and a recital of what constitutes its adulteration or misbranding, and immediately following is section 10, which reads as follows, and is measurably relied upon to sustain this prosecution: "It shall be unlawful for any person acting for himself or as the servant or agent of any other person, firm or corporation, to manufacture, sell, offer or expose for sale any article of food which is adulterated or misbranded within the meaning of this act. The possession by an innkeeper, hotel keeper, restaurant keeper, or boarding house keeper of any food or drug which is adulterated or misbranded within the meaning of this act shall bee deemed to be the keeping of such food or drug for sale." Neither the term "druggist" nor "medicine" was employed by the Legislature in this provision, and the unlawful possession of the adulterated or misbranded "drug," mentioned only in the final sentence, is unaccountably limited to the dispensers of food. The 23 sections of the statute immediately following the provision above quoted are devoted to dairy products and various articles of food, and the word "drug" as used in the act is first defined in section 34. Section 35, consisting of eight subdivisions, is declarative merely of what conditions are essential to constitute misbranded or adulterated drugs or articles .

of food; but no language is used therein tending in the slightest degree to evidence a legislative intent to make anything unlawful or justify the infliction of a penalty for the sale or offering for sale of prepared medicine "bearing no qualitative statement of what it is composed." While this section regulates nothing, and is merely descriptive of the articles of food and medicine mentioned therein and is incapable of transgression by any person, the provision immediately following, being section 36, declares that "any person violating any of the provisions of the preceding section of this act shall be deemed guilty of a misdeamor and upon conviction thereof shall be punished by a fine of not less than ten nor more than one hundred dollars or by imprisonment in the county jail not to exceed thirty days or by both such fine and imprisonment for each offense." Were it to be assumed, as contended by counsel for the food and dairy commissioner, that the expression "preceding section" might authoritatively be changed to "preceding sections," this prosecution would not be maintainable, for the reason that there is nothing in section 10 nor in any other provision of the "pure food law" authorizing the arrest of a druggist or making anything that is charged in the complaint a penal offense. According to an elementary rule of construction, the statutory enumeration of persons of the same class by specific terms, such as the keeper of an inn, hotel, restaurant, or boarding house, must be restricted to that class of individuals, and no consideration of the mischief to be remedied by the passage of the act is sufficient to justify the interpolation required to bring within its operation another class of persons whose business is distinctly different

It was orally argued and urged in the brief of counsel for the food and dairy commissioner that to carry out the intention of section 10, and make it broad enough to justify this prosecution, we should insert the phrase "or drugs" in the first sentence thereof, but that would require a most glaring invasion of the legislative prerogative, and amount to a judicial attempt to amend a statute definitely expressed in words of common speech. The headnote prepared by this court in Landauer v. Conklin, 3 S. D. 462, 52 N. W. 322, is as follows: "'A fundamental rule of interpretation

applied to statutes, mandatory as well as directory, is that words in a statute, if of common use, are to be taken in their natural and ordinary sense, without any forced or subtle construction either to limit or extend their import." Delivering the opinion of the court in United States v. Wiltberger, 5 Wheat. (U. S.) 76, Chief Justice Marshall said: "The intention of the Legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute is within its provisions so far as to punish a crime not enumerated in the staute, because it is of equal atrocity, or of kindred character, with those which are enumerated." The case of United States v. Sheldon, 2 Wheat. (U. S.) 119, 4 L. Ed. 199, was a prosecution under an indictment of the accused for transporting articles of provision and munitions of war overland from Vermont to Lower Canada, and the question of law presented was "whether driving living fat oxen, cows, steers, and heifers on foot is a transportation thereof" within the meaning of an act of Congress to prohibit trading with the enemy in time of war. The section of the statute upon which such prosecution was based made it a misdeamor punishable by a fine and imprisonment for any citizen to "transport, or attempt to transport, overland or otherwise, in any wagon, cart, sleigh, boat or otherwise, * * * any articles of provision, from the United States to Canada." In deciding that the means employed to transfer such animals from the United States to Canada did not amount to transportation within congressional meaning, the court said: "It may be admitted that the mischief is the same, whether the enemy be supplied with provisions in the one way or the other; but this affords no good reason for construing a penal law by equity, so as to extend it to cases not within the correct and ordinary meaning of the expressions of the law." While it is the

duty of the court to seek for and give effect to the meaning of the lawmakers, its research must not extend beyond legislative language when couched in words that are free from any ambiguity. Consequently it is not within judicial power to create a public offense by supplying words necessary to subject the accused druggist to the penalties of a statute which in plain terms relates only to a class of persons to which he does not belong. However inconsistent with the general policy of the enactment, it must be presumed that the words required to bring him within its operation were omitted in conformity with the legislative will. To thus supply terms, in whatever manner omitted from a statute that is penal in its nature, would be contrary to the prevailing doctrine, based upon a sound legal maxim and stated generally by Prof. Black as follows: "When a statute makes specific provisions in regard to several enumerated cases or objects, but omits to make any provision for a case or object which is analogous to those enumerated, or which stands upon the same reason, and is therefore within the general scope of the statute, and it appears that such case or object was omitted by inadvertence or because it was overlooked or unforeseen, it is called a 'casus omissus.' Such omissions or defects cannot be supplied by the courts." Black on Interpretation of Laws, 57.

There being no legal authority for the process under which the petitioner is restrained of his liberty nor general law to justify a conviction, his application to this court for a discharge on habeas corpus is granted.